UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFEREY JAMES MENZIES,

              Petitioner,

    vs.

M.E. SPEARMAN, Warden,

              Respondent.

No.  2:16-cv-2746-MCE-EFB P

FINDINGS AND RECOMMENDATIONS

      Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner challenges a judgment of conviction entered against him on August 19, 2013 in the Butte County Superior Court on charges of first degree murder (Cal. Penal Code §187(a)) with a special circumstance of lying in wait (Cal. Penal Code §190.2(a)(15)) and intentionally discharging a firearm, causing great bodily injury or death during commission of a murder (Cal. Penal Code §12022.53(d)).  He seeks federal habeas relief on the following grounds: (1) the trial court erred in admitting statements he made during two 'pretext' telephone calls into evidence; (2) the trial court erred when it allowed the prosecution to present video of petitioner shooting handguns while garbed in a collared shirt as impeachment evidence; and (3) the trial court's lying in wait special circumstance instruction violated his constitutional rights because it failed to meaningfully distinguish between commission of first

---

[1] The matter has been referred to the assigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302.

degree murder with and without the special circumstance. Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

**I. Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> In the early morning hours of September 21, 2011, David Yang drove to his job at a residential care facility. His commute took him along Highway 32, where he would turn onto Bruce Road. At about 3:21 a.m., officers found Yang dead in the driver's seat of his car, which was stopped partially in the left-hand turn lane and partially in the intersection of Highway 32 and Bruce Road. The car was still in gear, the engine was on, the turn signal was activated, and the brakes were engaged. The driver's side window was open, and the front passenger window was shattered, with glass both inside and outside the car where it was stopped and in the left-hand turn lane.
>
> Yang had been shot in the head, with the entry point for the bullet directly over his right ear and the exit point on the left side of his skull and forehead. The bullet wound was consistent with being shot by a high-velocity rifle. Evidence indicated the shot had come from outside the car and entered through the passenger window, and that it had likely come from a raised position in the direction of the southwest corner of the intersection, where there was a raised berm.
>
> Officers found a car parked near the intersection. In it, officers found a black rifle case containing a box of .270 Winchester-brand ammunition, some of which was missing, some expended, and some live; a .22–caliber rifle with a scope; military-issued clothing with defendant's name stitched into it; a scope cover; and a camouflage-colored magazine for a rifle. The .270 rifle was missing.
>
> At approximately 2:30 a.m., defendant had called his friend Daniel Slack. According to Slack, defendant sounded angry and said he "needed to go shoot something." When Slack suggested that defendant go to his family farm and shoot a can of gasoline, defendant responded that he "has an idea" and that he would get in touch with Slack later. Slack asked what he was going to do, and defendant told him to "watch the news." Defendant called Slack about two hours later and asked Slack to pick him up at defendant's house because he needed a ride. When Slack arrived at defendant's house, defendant placed a bag in the back of the truck, and they drove toward the intersection, which was by then blocked off by police. Slack asked defendant if he had anything to do with it, and defendant responded affirmatively. Since they could not get through

the intersection, they drove back to Slack's apartment. Defendant took the bag from the back of the pickup truck and threw it in the dumpster. They went to sleep, and after they woke up, defendant suggested they go for breakfast. They drove past the intersection on their way to breakfast and noticed the police were still there.

In the truck, Slack asked defendant what had happened the night before, and defendant said he "shot somebody on that corner." Initially, Slack did not believe him, in part because of defendant's calm demeanor. After breakfast, they drove past the intersection again to see if the police were still there. They were, so Slack and defendant went back to defendant's house. During the drive, Slack asked what had happened, and defendant said he "sat up on a hill ... and ... waited for the next car to come by and ... shot the person." On leaving defendant's house, Slack noticed the police had left the intersection, so he returned to defendant's house and drove defendant to where defendant had left his car, but the car was no longer there. Concluding the car had likely been towed, Slack drove defendant home and suggested defendant would have to talk to the police to get his car back. Slack also suggested defendant wash his hands before going to the police station, so that any gunpowder residue would be washed away. At defendant's house, defendant drew a crude map for Slack showing where he had taken the shot and where he had left the gun. Defendant told Slack he "walked through a dry creek bed, over a fence, through a field, and [the gun] was next to a tree underneath a bush." Slack then dropped defendant at the police station, drove home, and then went to work.

Later that day, two police officers approached Slack while he was working and asked if he knew anything about defendant's activities the night before. Initially, Slack was dishonest with the officers, but when pressed Slack told officers about the telephone calls, the car rides, and defendant's statement that he had shot someone. The officers then asked Slack to participate in pretext telephone calls with defendant. (The information obtained from these calls is summarized below.)

The next day, an officer searched the dumpster at Slack's apartment complex. In it, she found "a pair of men's blue jeans, [a] pair of black socks, and a faded black dark-colored polo-type shirt." The blue jeans had several fresh tears and bloodstains on the inside, and the shirt also had some tears or large snags and a lot of "plant matter" attached to it. A later inspection on September 23, 2011, also revealed defendant had a small laceration or puncture wound on his lower left leg, a scratch on the back of his left arm, a significant scratch on the left side of his front torso, small scratches on his back, and a puncture wound with surrounding bruising on the right side of his torso.

About a week after the shooting, based on information disclosed by defendant in a pretext call, an officer searched for the rifle used in the homicide in the Dead Horse Slough area northwest of the intersection. The officer found a rifle "right after the bend in the slough" under the branch of a tree next to a barbed wire fence on the south side of the embankment for the slough. The rifle was

registered to defendant.

During another search of the area along the barbed wire fence, an officer found blue denim-like material and black cotton knit fabric caught in the barbed wire about a hundred feet west of where defendant's car had been parked. The officer also found a black glove and a part of a label from a pair of jeans lying in the dry grass; the label appeared to match the torn label on the jeans found in the dumpster. The dark fabric removed from the barbed wire was consistent with the polo shirt found in the dumpster. Defendant could not be excluded as a contributor of the DNA culled from inside the glove, and his DNA profile matched the DNA profile pulled from the blood found inside the jeans located in the dumpster and that from the dark fabric caught in the barbed wire.

A couple of days later, a trained dog was used to search the area for shell casings. After finding nothing in the creek bed, the dog moved into the field, where his handler spotted a .270 shell casing. (The same dog and handler conducted a search on September 27, but did not find anything.) The casing had been cycled through the rifle located in the area, but was not necessarily fired from that weapon.

*People v. Menzies*, 2015 WL 5686769, at *1–2 (Cal.App. 3 Dist., 2015) (unpublished).

**II.  Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

4

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S. 34 (2011)); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

/////

/////

Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

/////

/////

/////

1    **III. Petitioner's Claims**

2         **A.      Fourth Amendment Claim**

3         In his first claim, petitioner argues that the trial court erred in admitting statements

4    obtained during illegal detentions.  ECF No. 1 at 5.[3]  The court of appeal considered this claim

5    and, in so doing, provided the following additional background:

6              The following evidence was provided at the hearing on defendant's
              motion to suppress evidence. On the afternoon of September 21,
7              2011, defendant came into the police station to inquire about his
              car, which had been towed from near the scene of the shooting. At
8              the time, defendant told Detective Hoffman he had been drinking at
              a bar in Durham the night before, had left the bar after closing, and
9              had driven back to Chico, where he had stopped near the
              intersection to observe an astrological phenomenon. Upon alighting
10             from his car, defendant realized he was too impaired to drive, so he
              walked home, leaving his car behind. With defendant's consent,
11             officers searched the car and found ammunition and a .22–caliber
              rifle. Defendant informed them that a .270 rifle with a scope and
12             bipod were missing.

13             That evening, at approximately 7:45 p.m., Detectives Stan
              Duitsman and Brian Miller interviewed Slack at work to ascertain
14             what he knew about the shooting. Duitsman was previously familiar
              with Slack and had learned he was friends with defendant. At first
15             Slack denied any knowledge, but on being pressed to be honest,
              Slack divulged that earlier that morning, defendant told Slack he
16             was in the field adjacent to the intersection where the shooting took
              place with his ".270 rifle" and had shot someone.  During the
17             course of the interview (between 7:45 p.m. and 8:45 p.m.), Miller
              called Detective Mark Hoffman to relay this information. Duitsman
18             then asked Slack if he would be willing to participate in a pretext
              telephone call with defendant.  In an effort to coordinate the pretext
19             call, Hoffman attempted to call defendant to have him come into
              the police station voluntarily.  His call went unanswered, so
20             Hoffman tasked other officers with surveilling defendant's home.

21             At about 8:00 p.m., Detectives Joel Schmid and Ben Love, who
              wore plain clothes and were in an unmarked truck with concealed
22             lights, began to conduct surveillance of defendant's residence.
              Schmid was directed to detain defendant if it appeared he was
23             leaving his house. He was told defendant was a suspect in a
              homicide based on the discovery of his vehicle, and that defendant's
24             whereabouts were unknown but that it was believed he may have
              been at home. At about 9:15 p.m., an unidentified man approached
25             the house and called for "Jeff." A man in a white T-shirt matching
              defendant's general physical description came outside, where the
26             two men talked and then entered the house together. Thereafter, a

27    ────────────────────

28       [3] Page number citations such as this one are to the page numbers reflected on the court's
     CM/ECF system and not to page numbers assigned by the parties.

pickup truck and sedan left the house in tandem. Schmid and Love began to follow the sedan, not knowing if defendant was in either vehicle. Other officers followed the truck.

Shortly after Detectives Schmid and Love began following the car, it pulled over to the shoulder of its own accord. Schmid turned on the concealed red and blue lights, and then approached the car wearing his police vest over his clothes. He discovered defendant was driving the car. Schmid asked defendant to get out of the car and patted him down for weapons. Schmid explained simply that he had been asked to stop defendant's car, and while they waited for other officers to arrive, they carried on a casual and benign conversation. In the course of the detention, defendant was not handcuffed, and Schmid expressly informed defendant he was not under arrest. Defendant asked if he could sit down, Schmid consented and also provided defendant with a soda.

Detective Hoffman arrived and asked defendant if he would come to the station to retrieve defendant's cell phone. Defendant replied, "Is—that ... all (unintelligible) is it all I'm doing—'cause I really, I mean, I'm, not to be rude, but like if you guys don't arrest me obviously that's...." Hoffman asked why they would arrest him, and defendant responded, "I don't know. I mean, you guys are all here, you know, so...." Detective Schmid reiterated that defendant was not under arrest, and defendant replied, "Oh, yeah right now. But yeah, I'll go down with you guys to get that." Hoffman and another officer drove defendant to the police station in the back seat of their unmarked police car.

At the station, defendant was invited to use the restroom in the lobby, and was informed he would be able to use the restroom and that the door to the interview room where he was being taken was unlocked. A key was required to enter the building, but none was required to exit; however, defendant was not informed of that fact. While Detective Hoffman was activating the recording system for the interview room, defendant opened the door and stated he needed to use the restroom, so Hoffman unlocked the door leading to the restroom and allowed defendant to walk through the lobby unescorted. Another officer was stationed in a hallway next to the lobby to "keep an eye" on defendant and to prevent defendant from leaving if he tried. However, defendant was not informed of this because officers wanted him to believe he was free to leave.

Officers returned defendant's cell phone to him while he was at the police station but asked him to wait for them to complete paperwork to release the phone to him. While defendant waited at the police station, Detective Duitsman monitored two pretext telephone calls between him and Slack, who was also at the police station. During the first call, Slack asked defendant if the police knew he had shot "that dude." Defendant did not deny shooting him. Slack then asked if defendant had removed the ".270," to which defendant replied, "Negative," and suggested that Slack could remove it. Slack asked why defendant had left his car there, and defendant responded that he did not know. Slack then asked what he should do with the gun, and defendant said "Deep water."

In the second call, Slack asked where exactly the gun was located, and defendant directed Slack to go northeast from the intersection, make a right, walk three houses in, walk across a dry ditch, and under an oak tree by the fence. Slack also asked why defendant had killed the victim, and defendant initially said they would talk about it later and then responded "I don't know," and that he was drunk. After the calls were conducted, Detective Hoffman asked defendant if he had told anyone that he had shot someone. Defendant then asked to speak to an attorney, and Hoffman ended the interview and placed defendant under arrest.

Defendant also testified at the motion to suppress hearing. It appeared to him that the officer who approached the car during the traffic stop had his weapon drawn. He was instructed to stop the car and put his hands up. He further described the patdown as "aggressive," and stated that "[i]t was clear to [him] that [he] wasn't able to ... leave," even if he was not arrested or handcuffed. Defendant acknowledged he voluntarily agreed to go to the police station because he was being cooperative.

The trial court found the initial detention, i.e., the traffic stop, was justified by Slack's statements to the police and the fact the cars came directly from defendant's house. The trial court found the further detention, i.e., at the police station, was justified by the information provided by Slack. Defendant contested the trial court's finding that the cars came directly from defendant's house, and argued the evidence demonstrated "two people walked out of view, they walk out of the house and out of view of the officers, and then two cars went by." Nonetheless, the trial court denied defendant's motion to exclude the statements defendant made to Slack during the pretext telephone calls.

*Menzies*, 2015 WL 5686769, at *4–5. The court of appeal then rejected this claim, reasoning:

### Initial Detention

Defendant first asserts Detectives Schmid and Love lacked reasonable suspicion to justify the initial detention of defendant because they did not know he was engaged in criminal conduct or that defendant was in the car they followed. We conclude no Fourth Amendment violation occurred during the initial detention to warrant suppression of defendant's statements to Slack during the pretext telephone calls.

In reviewing a trial court's ruling on a motion to suppress, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362; *see People v. Weaver* (2001) 26 Cal.4th 876, 924.) In reviewing the reasonableness of a detention, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (*United States v.*

*Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 749].)

That Detectives Schmid and Love were not privy to the information obtained by the homicide investigators does not limit our inquiry into the justification for the stop. Instead, "[u]nder the collective knowledge doctrine, we must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by 'look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action].' " (*United States v. Ramirez* (9th Cir.2007) 473 F.3d 1026, 1032.) "[W]hen police officers work together to build 'collective knowledge' of probable cause, the important question is not what each officer knew about probable cause, but how valid and reasonable the probable cause was that developed in the officers' collective knowledge." (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555.)

Here, Detective Hoffman had learned the victim had been shot in the early morning hours of September 21, 2011. He knew defendant's car was left abandoned near the intersection where the victim was shot. He knew defendant had multiple rifles and ammunition in his car. And he knew defendant had told Slack that he had used his .270 rifle to shoot at a man at the intersection that morning. Sergeant Daniel Fonseca, who was supervising the homicide investigation, learned from his detectives that a witness indicated defendant admitted shooting someone at the intersection that morning, and he had found the car registered in defendant's name near the intersection. Based on this information, Fonseca had reasonable suspicion defendant was involved in legal wrongdoing to support his directive to Detective Schmid to detain defendant, and Schmid, based on the collective knowledge doctrine, had reasonable suspicion to detain defendant.

Thus, we must address whether Detective Schmid had a reasonable suspicion to detain the driver of the car leaving defendant's house, when he did not know whether the driver was defendant. Here, Schmid had reason to believe defendant was at home. He had been informed defendant was likely at home, and when an unidentified man approached the house and called defendant's first name, a man matching defendant's general physical description walked out of the house, spoke to the unidentified man, and they both entered defendant's home together. Thus, when two vehicles thereafter left the house together "in tandem," Schmid had reasonable suspicion to believe defendant was in either one of the vehicles. And, particularly, Schmid had reason to suspect defendant was in the sedan Schmid followed because he had seen that car at the house earlier that evening. Therefore, it was appropriate for officers to detain the drivers of both vehicles in an effort to detain defendant, and the initial detention did not violate the Fourth Amendment.

/////

**Consent to Continued Detention**

We also reject defendant's contention that his continued detention on the side of the road, in the police car driving to the police station, and at the police station violated his Fourth Amendment rights because his consent was not voluntary and was fraudulently obtained. Whether consent is voluntary or coerced is a question of fact to be determined from the totality of the circumstances. (*See Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 863]; *People v. Jenkins* (2000) 22 Cal.4th 900, 973.)

First, we note that to the extent this contention is premised on some assertion of taint derived from the allegedly illegal initial detention, we have already concluded the initial detention was properly supported by reasonable suspicion. Therefore, such a contention is unavailing.

Defendant argues his consent is invalid because he was lured to the police station under false pretenses because the police never intended to allow him to leave once they gave him his cell phone. While an officer's use of deceptive practices to obtain consent is one relevant factor to be considered in determining whether consent is voluntarily given, "no single factor is dispositive of this factually intensive inquiry." (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1578.)

Officers did in fact want to provide defendant with his cell phone, for without it he would not be able to participate in the pretext telephone calls with Slack. Therefore, the officers' deception was only partial. Moreover, during this period, defendant was not physically restrained, arrested, or threatened in any manner, and nor has defendant asserted the detention was unduly prolonged, or that he was submitted to intimidating tactics. Indeed, while waiting for Detective Hoffman, defendant and the officers engaged in lighthearted small talk while defendant sat on the curb and drank an orange soda. And once he was taken to the police station, defendant was permitted to walk unaccompanied across the lobby to use the unlocked restroom and to return to the unlocked interview room where he waited alone.

Thus, this case is not like *People v. Reeves* (1964) 61 Cal.2d 268, 273, where police caused a hotel manager to call Reeves and falsely tell him he had a package so that they could peek inside his room when he opened the door because they lacked probable cause to search his room, or *People v. Reyes* (2000) 83 Cal.App.4th 7, 9, 12–13, where police lured the defendant to open his apartment door so they could gain access by concealing their identity, knocking on the door, asking if he owned a white truck parked outside, indicating they had struck it, and then, once in an alley, surrounding him in tactical gear and asking accusatory questions. Here, police did not induce defendant to surrender his privacy rights, hide that law enforcement was involved, or lure him into an intimidating situation. And, there was no evidence the police asked him any incriminating questions until after the pretext calls were completed.

1

2

3

4

5

6

7

8

9

10

> Second, defendant asserts officers refused his request to leave. He does not specifically indicate when such a request was made, and the record belies that any such request was made. Following the initial detention, Detective Hoffman arrived and asked defendant to accompany him to the police station to collect his cell phone. It is true defendant was initially hesitant, but he then agreed to come to the police station, noting that he had been advised he was not under arrest. He did not, during this interaction, ask to leave. Rather, defendant testified he agreed to accompany police to the station to be cooperative. It appears defendant may be arguing detectives refused to let him leave the police station once he had his cell phone. Hoffman did testify at the motion to suppress hearing that he led defendant to believe he would be free to leave once he got his cell phone, and upon giving him his cell phone told him he had to wait for release paperwork before he could leave. However, there is nothing in the record to indicate defendant asked to leave and was refused at this time either. Therefore, we fail to discern any refusal by officers of a request made by defendant to leave.

11

12

13

> Therefore, the initial detention was supported by reasonable suspicion that defendant had committed murder, and the continued detention was warranted by defendant's consent, which was voluntarily given. Accordingly, the trial court did not err in denying defendant's motion to suppress evidence of the statements he made to Slack during the two pretext telephone calls.

14 *Menzies*, 2015 WL 5686769, at *5–8. This claim was included in petitioner's petition for review

15 to the California Supreme Court, where it was summarily denied. Lodg. Doc. Nos. 2 & 3.

16       Respondent contends that this claim is not cognizable on federal habeas review. The court

17 agrees. In *Stone v. Powell*, the United States Supreme Court held that, so long as a petitioner was

18 provided an opportunity for full and fair litigation of a Fourth Amendment claim in state court, a

19 federal court was precluded from granting habeas relief on the ground that evidence was obtained

20 in violation of that amendment. 428 U.S. 465 (1976). The Ninth Circuit has emphasized that

21 "[t]he relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether

22 he did in fact do so or even whether the claim was correctly decided." *Ortiz-Sandoval v. Gomez*,

23 81 F.3d 891, 899 (9th Cir. Cal. 1996). Petitioner was afforded a full and fair opportunity to

24 litigate this claim in state court when his trial counsel filed a motion to suppress the evidence

25 pursuant to § 1538.5 and the trial court rendered an adverse decision. Lodg. Doc. No. 4

26 (Reporter's Transcript Vol. II) at 369-370. Further, as noted *supra*, petitioner challenged that

27 decision on direct appeal and in a petition for review to the California Supreme Court. As such,

28 /////

this claim is not cognizable.[4] *See Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990) (citing

Cal. Penal Code § 1538.5 and noting "[u]nder California law, a defendant can move to suppress

evidence on the basis that it was obtained in violation of the fourth amendment.").

### B.    Admission of Impeachment Evidence

Next, petitioner claims that the trial court erred when it allowed the prosecution to present

impeachment video of him firing a handgun while wearing a red and blue collared shirt. The

court of appeal considered this claim and rejected it, reasoning:

> Defendant contends the trial court prejudicially erred when it permitted the People to present to the jury as impeachment evidence a video of defendant shooting handguns while wearing a collared red and blue shirt. Even if defendant had not forfeited this contention by failing to object to the admission of the evidence in the trial court, he would not prevail. For it was not an abuse of discretion for the trial court to admit the evidence for impeachment purposes.
>
> During defendant's case-in-chief, he presented testimony from his girlfriend that he wore a size large shirt, that he always wore casual clothes, i.e., T-shirts and shorts, and that he did not wear polo shirts or collared shirts, but she did recall that he had worn a collared cowboy-style shirt on a date once. His father also testified that he had seen defendant in a polo shirt before, but not a black one. However, they both recalled that Slack frequently wore darker colored clothing, including black polo shirts.
>
> The People proposed to play two short video clips in which defendant is wearing a collared shirt. In one video, defendant is shooting handguns in a rural setting, and, in the other, defendant is shooting what appears to be the rifle at issue in this matter. Defendant argued, pursuant to Evidence Code section 352, that showing one of the videos might be appropriate, but not both, and that the video of defendant shooting the rifle is unduly prejudicial and offers no more probative value than the video of defendant shooting handguns. The trial court permitted the video of defendant shooting handguns to be admitted for the purposes of rebutting information regarding whether defendant wore collared shirts. It also provided a limiting instruction that the jury could "consider that video only for the purpose of showing the defendant wearing certain clothing."

---

[4] The matter might be different if petitioner were raising a *Miranda* challenge based on these detentions. *See Withrow v. Williams*, 507 U.S. 680, 683 (1993). His petition provides no indication of such a claim, however, and his brief before the court of appeal attacks the legality of the detentions rather than raising a cognizable *Miranda* claim. ECF No. 1; Lodg. Doc. No. 7 at 23-52.

14

Evidence is not rendered inadmissible by section 352 "unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.) The court's exercise of discretion under section 352 will not be reversed on appeal absent clear and manifest abuse. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.) Thus, to justify appellate intrusion, the trial court must have exercised its discretion "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

There was evidence presented that the shooter had worn a black polo shirt at the time of the shooting, and defendant presented evidence that he did not wear collared shirts or polo shirts. The video showed defendant wearing a polo shirt. Therefore, contrary to defendant's assertion on appeal, the video does rebut the witnesses' testimony that he does not wear polo-type or collared shirts, and thereby serves to undermine the girlfriend's and father's credibility as defense character witnesses.

The only possible prejudice we can conceive that would result from viewing the video would be for the jury to discover that defendant enjoys shooting guns. However, it was never disputed that defendant enjoyed shooting guns, or that he owned guns. Indeed, his own girlfriend testified that they liked to shoot together, and defendant informed police himself that his .270 rifle was allegedly missing from his car following the murder. That he smiles and laughs lightheartedly with an off-screen companion at the end of the seven-second video clip does not indicate he "is predisposed to engage in dangerous or lethal gunplay for amusement without due regard for potentially serious consequences."

Therefore, the probative value of the evidence to directly rebut evidence that defendant would not have worn the black polo shirt found in the dumpster and to indirectly undermine defendant's character witnesses, was not "substantially outweighed" by the risk of undue prejudice. Accordingly, we find no abuse of discretion in the trial court's decision to admit the evidence.

Defendant's derivative due process assertion likewise fails. (*See People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104 [due process assertion necessarily depends on whether the trial court sufficiently and properly evaluated the proffered evidence under § 352].) Here, we have concluded the impeachment evidence was properly admitted under section 352, and defendant has not shown that the circumstances present were so extraordinary or unusual that admission of the evidence violated his constitutional right to due process of law.

*Menzies*, 2015 WL 5686769, at *8–9. This claim was included in petitioner's petition for review to the California Supreme Court, which was summarily denied. Lodg. Doc. Nos. 2 & 3.

/////

## 1. **Applicable Law**

It is well established that "[e]ven where it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial." *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). "A habeas petition bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). The Ninth Circuit has explained that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted).

## 2. **Analysis**

As a preliminary matter, respondent contends that this claim is procedurally barred. ECF No. 11 at 21. The court need not reach this argument, however, because it finds that this claim fails on the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[C]ourts are empowered to, and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar.").

The court of appeal's denial of this claim was neither contrary to or an unreasonable application of clearly established federal law. As noted above, the Supreme Court has never held that the admission of prejudicial evidence is a *per se* violation of a defendant's due process. Petitioner is therefore required to show that the admission of this evidence rendered his trial fundamentally unfair. He has, for the reasons stated hereafter, failed to make that showing.

First, the court of appeal reasonably concluded that this evidence had probative value. At trial, a witness testified that petitioner had thrown a bag into a dumpster after the killing. Lodg. Doc. No. 4 (Reporter's Transcript Vol. III) at 711. Police subsequently searched the dumpster and retrieved, among other things, a black polo shirt. *Id*. at 788-789. The shirt's fabric matched fabric found in the area where the murder weapon was recovered. *Id*. at 849-853. The defense

presented testimony from a character witness that petitioner generally wore casual clothes and that she had no recollection of him ever wearing a polo shirt.  Lodg. Doc. No. 4 (Reporter's Transcript Vol. IV) at 1109-1110.  The video was therefore relevant insofar as it undermined the testimony of the character witness and offered a rebuttal to the contention that petitioner would not have worn the shirt found in the dumpster.  *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.").

Second, the court of appeal was also reasonable in concluding that this evidence was not unduly prejudicial.  There was no dispute that petitioner owned guns and enjoyed shooting them. The same character witness whose testimony was undermined by the video also testified that she was aware that petitioner owned guns and that she had shot recreationally with him.  Lodg. Doc. No. 4 (Reporter's Transcript Vol. IV) at 1107.  Additionally, the trial court instructed the jury that it could consider the video "only for the purpose of showing the defendant wearing certain clothing" (Lodg. Doc. No. 6 (Clerk's Transcript Vol. II) at 434) and the jury is presumed to have followed that instruction.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Based on the foregoing, the court concludes that the admission of this evidence did not render petitioner's trial fundamentally unfair and his claim should be denied on that basis.

## C.     Lying in Wait Special Circumstance

Finally, petitioner contends that the lying in wait jury instruction offered at his trial violated his constitutional rights by failing to meaningfully distinguish between the commission of first degree murder with that special circumstance and without it.  The court of appeal considered and rejected this claim:

> Defendant contends the lying-in-wait special circumstance as interpreted by the California Supreme Court and as articulated in the jury instruction employed in the instant case violates the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because it does not meaningfully distinguish between those who commit first degree murder with and without the special circumstance. The trial court gave the standard lying-in-wait special circumstance instruction, as set forth in CALJIC No. 728, which, as given to the jury, stated in relevant part: "To prove that [the lying-in-wait] special circumstance is true, the People must prove that, one, the defendant intentionally killed David Yang. And, two, the

defendant committed the murder by means of lying in wait. [¶] A person commits a murder by means of lying in wait if, one, he or she concealed his or her purpose from the person killed. Two, he or she waited and watched for an opportunity to act. Three, then he or she made a surprise attack on the person killed from a position of advantage. And, four, he or she intended to kill the person by taking the person by surprise."

Defendant concedes the California Supreme Court has repeatedly rejected similar challenges on the merits (see, e.g., *People v. Mendoza* (2011) 52 Cal.4th 1056, 1095; *People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v. Cruz* (2008) 44 Cal.4th 636, 678; *People v. Lewis* (2008) 43 Cal.4th 415, 515–516; *People v. Stevens* (2007) 41 Cal.4th 182, 203; *People v. Jurado* (2006) 38 Cal.4th 72, 145–147 (conc. opn. of Kennard, J.); *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149; *People v. Sims* (1993) 5 Cal.4th 405, 434), but nonetheless raises the contention to preserve it for further review. In light of existing precedent, and assuming defendant did not forfeit this contention by failing to raise it in the trial court, we reject defendant's contention. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Menzies*, 2015 WL 5686769, at *9. This claim was included in petitioner's petition for review to the California Supreme Court, which was summarily denied. Lodg. Doc. Nos. 2 & 3.

## 1. **Applicable Law**

The Eighth Amendment requires that a capital sentence "not be imposed in an arbitrary or capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). To satisfy the Eighth Amendment, "a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (internal quotations and citations omitted). It is well settled, however, that this jurisprudence does not extend beyond capital cases. In *Harmelin v. Michigan*, the Supreme Court refused to extend the same analysis to a sentence of life without parole and emphasized that "[o]ur cases creating and clarifying the individualized capital sentencing doctrine have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." 501 U.S. 957, 995 (1991).

With respect to California's lying in wait special circumstance, the Ninth Circuit has previously held that it is neither void for vagueness nor violative of the Eighth Amendment. In *Houston v. Roe*, the court held:

> [T]he California legislature and courts have created a thin but meaningfully distinguishable line between first degree murder lying in wait and special circumstances lying in wait. *See People v. Superior Court*, 134 Cal. App. 3d 893, 184 Cal. Rptr. 870, 872-73 (Cal. Ct. App. 1982). First degree murder is statutorily defined as "murder which is perpetrated by means of . . . lying in wait." Cal. Penal Code § 189. Special circumstance murder is statutorily defined as murder where the "defendant intentionally killed the victim while lying in wait." Cal. Penal Code § 190.2(15). The distinction is found in the terms "while" and "by means of." California courts read "while" to require that the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist.

177 F.3d 901, 907-908 (9th Cir. 1999). In *Morales v. Woodford*, the Ninth Circuit rejected an Eighth Amendment 'arbitrary or capricious' challenge to the special circumstance, reasoning that "[t]he lying-in-wait circumstance is not overly broad such that it applies to every defendant convicted of a murder." 388 F.3d 1159, 1175 (9th Cir. 2003) (internal quotation marks omitted). The court in *Morales* went on to illustrate several examples of non lying in wait murder:

> [A] sadistic person who wants the victim to know what is coming, and who has no doubt of his ability to accomplish the crime, may confront the victim face to face, say "I'm going to kill you," and do so. Or a person intending to kill another may threaten the victim, travel armed, and when he spots his intended victim by chance, approach him and shoot him face to face. Or, not uncommonly, the loser of a bar fight may say "I'm going to kill you," go to his car or his home and get a gun, come back to the bar, confront the victim saying "now I'm going to kill you," and do so. Even under the California Supreme Court's liberal interpretations of lying in wait, these hypothetical first-degree murders would not merit the special circumstance.

*Id.*

## 2. Analysis

Respondent correctly points out that petitioner lacks standing to bring an Eighth Amendment challenge to the lying in wait special circumstance because he was not sentenced to death. As noted *supra*, the Supreme Court has drawn a clear line between the death penalty and all other forms of punishment, including life without parole. Thus, to the extent petitioner is arguing that the foregoing capital jurisprudence should be extended to his own non-capital

sentence, that argument is unavailing.  The Ninth Circuit has rejected attempts to broaden the jurisprudence to sentences of life without parole, reasoning that "if we put mandatory life imprisonment without parole into a unique constitutional category, we'll be hard pressed to distinguish mandatory life with parole; the latter is nearly indistinguishable from a very long, mandatory term of years; and that, in turn, is hard to distinguish from shorter terms." *Harris v. Wright*, 93 F.3d 581, 584-585 (9th Cir. 1996).

The immediate petition does not cite any supportive cases or even denote how petitioner is challenging the lying in wait special circumstance.  Rather, it states only that "[t]he Court of Appeal decision was contrary to clearly established law and based on an unreasonable determination of the facts in light of the evidence presented in the state court."  ECF No. 1 at 8.  Looking beyond the immediate petition to the petition for review filed with the California Supreme Court (Lodg. Doc. No. 2), it becomes apparent that petitioner is challenging the special circumstance as violative of due process under the Fifth and Fourteenth Amendments and cruel and unusual pursuant to the Eighth and Fourteenth Amendments.  *Id*. at 30.  The state court petition for review also acknowledged, however, that the United States Supreme Court has not issued any decision which resolves these questions.  *Id*.  As such, there is no clearly established federal law on this issue and relief is precluded.  *See Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (without a Supreme Court decision that squarely addresses an issue "it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent . . . and so we must defer to the state court's decision.").

### D.  *Pitchess* Discovery

In his traverse, petitioner raises a new claim which argues that he never had access to sealed materials which the trial court and court of appeal considered in denying (and upholding the denial of) his motion pursuant to *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974).  ECF No. 17 at 33.  He asks the court to review the sealed materials to determine whether the court of appeal properly denied relief.  *Id.*  This claim was not raised in the petition and the court declines

/////

/////

20

to consider a claim raised for the first time in a traverse. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief.").

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: May 2, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE